UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
1901 S. BELL STREET, SUITE 200
ARLINGTON, VA 22202


Johnson and Masumi
Alves , Nefertiti
8300 Boone Blvd
Suite 225
Vienna, VA  22182

In the matter of                  File A 076-388-332         DATE: Jul 25, 2019
SANCHEZ, JOSE ALBERTO

\_\_ Unable to forward - No address provided.

_X_ Attached is a copy of the decision of the Immigration Judge. This decision is final unless an appeal is filed with the Board of Immigration Appeals within 30 calendar days of the date of the mailing of this written decision. See the enclosed forms and instructions for properly preparing your appeal. Your notice of appeal, attached documents, and fee or fee waiver request must be mailed to:     Board of Immigration Appeals
                                 Office of the Clerk
                                 5107 Leesburg Pike, Suite 2000
                                 Falls Church, VA 22041

\_\_ Attached is a copy of the decision of the immigration judge as the result of your Failure to Appear at your scheduled deportation or removal hearing. This decision is final unless a Motion to Reopen is filed in accordance with Section 242b(c)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1252b(c)(3) in deportation proceedings or section 240(b)(5)(C), 8 U.S.C. § 1229a(b)(5)(C) in removal proceedings.  If you file a motion to reopen, your motion must be filed with this court:
                                 IMMIGRATION COURT
                                 1901 S. BELL STREET, SUITE 200
                                 ARLINGTON, VA 22202

\_\_ Attached is a copy of the decision of the immigration judge relating to a Reasonable Fear Review. This is a final order. Pursuant to 8 C.F.R. § 1208.31(g)(1), no administrative appeal is available. However, you may file a petition for review within 30 days with the appropriate Circuit Court of Appeals to appeal this decision pursuant to 8 U.S.C. § 1252; INA §242.

\_\_ Attached is a copy of the decision of the immigration judge relating to a Credible Fear Review. This is a final order. No appeal is available.

\_\_ Other: _____
           _____

                                            _[signature]_____
                                            COURT CLERK
                                            IMMIGRATION COURT            FF

     cc: Marie Vanderbilt-Mathews, DHS ACC
         1901 S Bell ST STE 900
         Arlington, VA, 22202

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
United States Immigration Court
1901 South Bell Street, Suite 200
Arlington, VA 22202

| | |
|---|---|
| IN THE MATTER OF: ) | IN WITHHOLDING ONLY PROCEEDINGS |
| ) | |
| SANCHEZ, Jose Alberto,[1] ) | File No.:  A 076 – 388 – 332 |
| ) | |
| Applicant. ) | |

APPLICATIONS:  Withholding of removal, pursuant to Section 241(b)(3) of the Immigration and Nationality Act ("INA" or "the Act"); and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Convention Against Torture" or "CAT"), pursuant to 8 C.F.R. §§ 1208.16–.18 (2019).

**APPEARANCES**

ON BEHALF OF THE APPLICANT:
Nefertiti Alves, Esq.
Johnson & Masumi, P.C.
8300 Boone Blvd., Suite 225
Vienna, VA 22182

ON BEHALF OF DHS:
Marie Vanderbilt, Esq.
Assistant Chief Counsel
U.S. Department of Homeland Security
1901 South Bell Street, Suite 900
Arlington, VA 22202

**DECISION AND ORDERS OF THE IMMIGRATION JUDGE**

I.  PROCEDURAL HISTORY

The Applicant is a native and citizen of Mexico. *See* Exh. 2. He first entered the United States without inspection on May 21, 1993. *Id.* The Applicant testified he returned to Mexico in 1994 for approximately three months before reentering the United States on June 10, 1994. *Id.* He remained in the United States until he was removed by the Department of Homeland Security ("DHS") on January 8, 2000. *See* Exh. 1. The Applicant testified he last entered the United States in April 2006. On December 28, 2018, after an asylum officer determined the Applicant did not have a reasonable fear of persecution or torture, the DHS referred the matter to the Immigration Court for withholding-only proceedings. *See id.*

---

[1] The Applicant is also known as "Juan Curtis MARTINEZ PEREZ," "Concepcion POLANCO FLOREZ," and "Jose Concepcion FLORES POLANCO." *See* Exh. 1.

In the Matter of Jose Alberto SANCHEZ
A 076 – 388 – 332

      On March 7, 2019, the Applicant, through counsel, filed an Application for Asylum and for Withholding of Removal (Form I-589), seeking withholding of removal under the Act and protection under the CAT. *See* Exh. 2. At a preliminary hearing on April 3, 2019, counsel for the Applicant expressed concerns regarding the Applicant's mental health and ability to access medications at the detention facility. Based on counsel's representations, the Immigration Court requested that the DHS provide the Applicant's medical records to the Immigration Court and continued the Applicant's case to conduct a judicial competency inquiry. On April 26, 2019, the Immigration Court received the Applicant's medical records from the government. *See* Exh. 7. Subsequently, on May 6, 2019, the Immigration Court conducted a judicial competency inquiry in order to assess the Applicant's competency. In doing so, the Immigration Court assessed both the Applicant's ability to meaningfully participate in his removal proceedings in accordance with *Matter of M-A-M-*, 25 I&N Dec. 474 (BIA 2011) and his ability to assist counsel with the preparation of his case. After conducting the judicial competency inquiry, the Immigration Court found that a preponderance of the evidence established that the Applicant was competent to proceed.

      On May 20, 2019, the Immigration Court conducted an individual hearing regarding the Applicant's applications. For the reasons that follow, the Immigration Court finds the Applicant ineligible for withholding of removal under the Act and the CAT, but grants the Applicant's application for deferral of removal under the CAT.

## II. SUMMARY OF THE EVIDENCE

### A. Documentary Evidence

| | |
|---|---|
| Exhibit 1: | Notice of Referral to Immigration Judge (Form I-863), the Record of Negative Reasonable Fear Finding and Request for Review by Immigration Judge (Form I-898), Record of Determination/Reasonable Fear Worksheet (Form I-899), and Notice of Intent to Reinstate Prior Order (Form I-871), filed January 22, 2019; |
| Exhibit 2: | Form I-589, filed March 7, 2019; |
| Exhibit 3: | Witness List and Exhibits in Support of Form I-589, including Tabs A–R, filed March 22, 2019; |
| Exhibit 4: | Supplemental Exhibits in Support of Form I-589, including Tabs S–T, filed March 25, 2019; |
| Exhibit 5: | DHS Notice of Filing, including pages 1–44, filed March 25, 2019; |
| Exhibit 6: | Supplemental Exhibits in Support of Form I-589, including Tabs A–F, filed May 2, 2019; |
| Exhibit 7: | DHS Notice Filing of the Applicant's Medical Records, filed April 26, 2019; |
| Exhibit 8: | DHS Supplemental Brief on the Particularly Serious Crime Bar, including Tab A, filed April 26, 2019; |
| Exhibit 9: | DHS Notice of Filing, including Tabs A–I, filed May 8, 2019; |
| Exhibit 10: | Updated Witness List and Supplemental Exhibits in Support of Form I-589, including Tabs U–V, filed May 13, 2019; and |
| Exhibit 11: | Insight Crime, *Mexico's Zetas: From Criminal Powerhouse to Fragmented Remnants* (Apr. 6, 2018), filed May 20, 2019. |

In the Matter of Jose Alberto SANCHEZ
A 076 – 388 – 332

### B. Summary of the Claim

On May 29, 2019, the Immigration Court heard testimony from the Applicant, the Applicant's sister, and an expert witness. Although considered by the Immigration Court in its entirety, the Applicant's testimony is not fully repeated herein because it is part of the record. Rather, the claims raised are summarized below to the extent they are relevant to the Immigration Court's analysis.

*1. Testimony of the Applicant*

The Applicant testified that he is afraid to return to Mexico for two reasons. First, the last time he resided in Mexico, the family members of Lucas Flores threatened him over a land dispute. The Flores family allegedly believes the Applicant's family ranch is on property that belongs to them. In April 2006, the Applicant fled to the United States after the Flores family threatened him that he had 24 hours to vacate his property. The Applicant's relatives in Mexico continue to reside at the ranch and continue to have "issues" with the Flores family. The Applicant testified his uncle went to the police to report the Flores family; however, the Applicant does not believe the police helped him. During cross-examination, he testified that an attorney has gotten involved in the land dispute.

Second, the Applicant fears the Los Zetas drug cartel. He believes the cartel will kill him because they believe he stole drugs and money from them. In 2009, the police confiscated drugs and money found in the Applicant's home in Virginia. The Applicant testified he was holding the drugs for his friend, Jose Flores Miramontes, and he later learned that Jose had obtained the drugs from the Los Zetas cartel. On August 15, 2009, after the drugs and money were confiscated, Jose called the Applicant to say members of the cartel wanted to talk to him. He was told to go to a parking lot, but when he got there, two men he did not know approached him. They took the Applicant to a ranch where they said Jose would be waiting. When they arrived, Jose was not there. The two men asked the Applicant where the money and drugs were. When he told them the police had confiscated everything, the men kicked and punched the Applicant in the stomach. The men told him that he had to pay back the money, or they would kill him. Since 2009, members of Los Zetas have approached the Applicant's family members in Mexico to ask where he is and when he will be removed to Mexico. Most recently, people who identified themselves as members of Los Zetas approached the Applicant's uncle, Juan Flores, and told him that they will kill the Applicant when they find him. On separate occasions, members of Los Zetas spoke to the Applicant's other uncle, Jose Polanco, in Mexico seeking information about the Applicant. The Applicant believes his uncle reported the incidents to the police; however, his uncle is now scared to go to the police again because his son—the Applicant's cousin—recently went missing. Although they cannot know for sure, the Applicant and his family believe the cousin was kidnapped by Los Zetas. The Applicant also reported that his two children living in Mexico have received telephone calls from Los Zetas looking for the Applicant.

*2. Testimony of Alma B. Flores Polanco, the Applicant's Sister*

Ms. Flores Polanco testified that she is the Applicant's sister. She confirmed that she has heard from her family in Mexico that members of the Los Zetas cartel are currently seeking

In the Matter of Jose Alberto SANCHEZ
A 076- 388 – 332

information about the Applicant. Specifically, she testified she was told that members of Los Zetas have approached her uncle, Jose Polanco, on numerous occasions and asked where the Applicant is. Her uncle told her that the men threatened to kill the Applicant once he is back in Mexico. She further confirmed that Los Zetas told her other uncle, Juan Flores, they will kill the Applicant to "get even." Although Ms. Flore Polanco could not confirm exactly when the threats began, she believes they have been ongoing for a number of years. She also stated that Los Zetas have threatened the Applicant's children who live in Mexico. She explained that the children now move often and constantly change their phone numbers to avoid detection. They are afraid they will be harmed in retaliation against their father, which Ms. Flores Polanco testified was a common practice of Los Zetas. Further, Ms. Flores Polanco confirmed that her cousin disappeared on March 21, 2019 in Mexico, and the family believes Los Zetas kidnapped him. The family reported the disappearance to the police, but Ms. Flores Polanco did not believe the police were doing enough to find him.

Ms. Flores Polanco believes Los Zetas will kill her brother if he returns to Mexico in retaliation for the police confiscating drugs and money from the Applicant in 2009. She does not believe he will be able to internally relocate to avoid Los Zetas because he will need to apply for an identification card that includes his address in order to get a job in Mexico. She believes Los Zetas can use the identification card to find the Applicant wherever he goes. She also does not believe the Mexican government can protect her brother from harm because it is corrupt. She stated that the police say they will investigate, but "they do not do anything about it."

### 3. Testimony of Lieutenant Colonel Robert O. Kirkland, Expert Witness

Colonel Kirkland is an expert in the operation of drug cartels throughout Mexico and Central America. He stated that he was paid $500 to testify and submit an affidavit on the Applicant's behalf. In the past three years, he has testified in approximately 38 cases, the majority of which were immigration proceedings. Approximately 50 percent of those cases involved issues related to Mexico. He stated that he generally declines to take cases where he does not believe the person would be harmed if removed from the United States.

Colonel Kirkland testified that he is familiar with how Mexican drug cartels operate in the United States, and most of them utilize proxies—such as local gangs or other individuals affiliated with the drug distribution network—to distribute their drugs in the United States. Colonel Kirkland was not aware of a direct Los Zetas presence in the Washington, D.C. area; thus, he assumes whoever threatened the Applicant in the United States after the drugs and money were confiscated was a local Los Zetas affiliate.

When asked on cross-examination about the current power of Los Zetas in Mexico, Colonel Kirkland confirmed that the Mexican government has been successful in "taking down key members of the cartel," which has led to internal fragmentation and loss of territory and power over the last four years. Despite territory losses, Colonel Kirkland does not think there is anywhere within Mexico that the Applicant could safely relocate. Even if the Applicant moved to an area controlled by a rival cartel, Colonel Kirkland testified that he has seen the cartels work together to detain persons-of-interest because "it is in the interest of all of the cartels to sow fear and make sure people remain scared of the cartels." Further, Colonel Kirkland testified it is quite common

In the Matter of Jose Alberto SANCHEZ
A 076 – 388 – 332

for drug cartels like Los Zetas to employ corrupt government officials or to bribe government officials to assist them in their criminal enterprise. He explained that when the Applicant returns to Mexico, he will need to apply for a government identification card, driver's license, and medical insurance, all of which require he disclose a permanent address to the government; thus, even if the Applicant attempted to relocate, Los Zetas likely could find the Applicant by asking government officials in its employ or by bribing an official to access his address through their databases. He testified, "This is a pretty easy thing." Colonel Kirkland acknowledged that in the short-term, the Applicant could attempt to hide, but he was concerned with the Applicant's ability to remain hidden from the cartel in the long-term, as he would need to register for an identification card in order to find employment.

### III. LAW, ANALYSIS, AND FINDINGS

#### A. Credibility and Corroboration

When an applicant offers testimony to support his application for relief, the Immigration Court must determine whether such testimony is credible. INA § 240(c)(4)(B). The REAL ID Act of 2005 governs the credibility analysis for cases in which the applicant filed for relief on or after May 11, 2005. *Matter of S-B-*, 24 I&N Dec. 42, 42–43 (BIA 2006). Considering the totality of the circumstances and all relevant factors, the Immigration Court may base a credibility determination on the applicant's demeanor, candor, or responsiveness and the inherent plausibility of the applicant's account. INA § 240(c)(4)(C); *see also Matter of J-Y-C-*, 24 I&N Dec. 260, 262 (BIA 2007). The Immigration Court may also consider the consistency between the applicant's written and oral statements; the internal consistency of each such statement; the consistency of such statements with other evidence of record; and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim. INA § 240(c)(4)(C). The Immigration Court may also consider any other factor relevant to credibility. INA § 240(c)(4)(C); *see also J-Y-C-*, 24 I&N Dec. at 262–63.

Considering the totality of the circumstances and all relevant factors, the Immigration Court finds the Applicant credible. His testimony was responsive, detailed, internally consistent, and consistent with the testimony of his witnesses. Moreover, the Applicant was candid and forthright when discussing his criminal history. Additionally, much of his testimony was corroborated by independent record evidence. *See e.g.,* Exh. 1 (reasonable fear interview transcript); Exh. 2 (Form I-589); Exh. 3, Tab M (expert witness affidavit), Tab N (the Applicant's sister's affidavit), Tab O (affidavit from the Applicant's uncle, Jose Polanco), Tab Q (affidavit of the Applicant's uncle, Juan Flores), Tab R (evidence confirming land dispute with neighbors in Mexico); Exh. 7 (the Applicant's medical records); Exh. 8, Tab A (the Applicant's conviction records); Exh. 10, Tabs U–V (evidence confirming the Applicant's cousin disappeared in March 2019). DHS counsel also did not raise any specific concerns regarding the Applicant's credibility. Accordingly, the Immigration Court finds the Applicant credible.

The Immigration Court also finds Ms. Flores Polanco credible. She provided detailed, candid, and sincere testimony regarding her relationship with the Applicant and her communications with her family members in Mexico. Moreover, her testimony was internally consistent and consistent with her written statement and other record evidence. *See* Exh. 3, Tab N

(her affidavit), Tab O (affidavit from the Applicant's uncle, Jose Polanco), Tab Q (affidavit of the Applicant's uncle, Juan Flores), Tab R (evidence confirming land dispute with neighbors in Mexico). DHS counsel also did not raise any specific concerns regarding Ms. Flores Polanco's credibility. Accordingly, the Immigration Court finds her credible.

The Immigration Court further finds the Applicant's expert witness, Colonel Kirkland, credible. His testimony was detailed, plausible, and internally consistent. Importantly, his testimony was also consistent with the country conditions evidence presented by both parties. *See e.g.*, Exh. 3, Tabs A–K (various articles discussing government corruption and drug cartels in Mexico); Exh. 5 (DHS filing of country conditions evidence); Exh. 9 (DHS filing of additional country conditions evidence); Exh. 11 (article on Los Zetas). The Immigration Court also found Colonel Kirkland's testimony regarding how Mexican drug cartels operate in the United States and in Mexico particularly ~~helpful~~ informative. DHS counsel also did not raise any specific concerns regarding Colonel Kirkland's credibility. Accordingly, the Immigration Court finds Colonel Kirkland credible.

## B. Withholding of Removal

An applicant is ineligible for withholding of removal under the Act and the CAT if he has been convicted of a particularly serious crime. INA § 241(b)(3)(B)(ii); 8 C.F.R. § 1208.16(c)(4), (d)(2). For purposes of withholding of removal, a crime is *per se* particularly serious if an alien commits an aggravated felony or felonies for which he has been sentenced to an aggregate term of imprisonment of at least five years. INA § 241(b)(3)(B); 8 C.F.R. § 1208.16(d)(2); *Matter of Y-L-*, 23 I&N Dec. 270, 273 (A.G. 2002) ("[A]liens who have been convicted of aggravated felonies and sentenced to at least five years imprisonment are *automatically* deemed to have committed a 'particularly serious crime.'"). However, a crime may be particularly serious even if it is not a particularly serious crime *per se*. *Matter of N-A-M-*, 24 I&N Dec. 336, 340 (BIA 2007); *see Matter of M-H-*, 26 I&N Dec. 46, 50 (BIA 2012). Relevant to the present case, "aggravated felonies involving unlawful trafficking in controlled substances presumptively constitute 'particularly serious crimes' within the meaning of section 241(b)(3)(B)(ii)" of the Act. *Y-L-*, 23 I&N Dec. at 274.

The DHS argues the Applicant's conviction for possession with intent to distribute a controlled substance, to wit: cocaine, under section 18.2-248 of the Virginia Code constitutes a particularly serious crime *per se* because it is an aggravated felony for which the Applicant received a sentence of at least five years. *See* Exh. 8 at 2–3; DHS Supp. Br. at 2–3 (May 3, 2019); INA § 241(b)(3)(B); 8 C.F.R. § 1208.16(d)(2). To determine whether a state law conviction qualifies as an aggravated felony, the Immigration Court applies the categorical approach and considers only the elements of the statute of conviction rather than any underlying conduct. *Mellouli v. Lynch*, 135 S. Ct. 1980, 1987 (2015) ("The categorical approach has been applied routinely to assess whether a state drug conviction triggers removal under the immigration statute."). Under this approach, "we look 'not to the facts of the particular prior case,' but instead to whether 'the state statute defining the crime of conviction' categorically fits within the 'generic' federal definition of a corresponding" federal offense. *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013) (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 186 (2007)). Only if the state offense

necessarily involved facts equating to the generic federal offense is it a categorical match. *Id.* (citing *Shepard v. United States*, 544 U.S. 13, 24 (2005) (plurality opinion)).

For an offense to qualify as an aggravated felony under INA § 101(a)(43)(B), it must either contain a trafficking element such that it involves "the unlawful trading or dealing of a controlled substance," *Matter of Flores-Aguirre*, 26 I&N Dec. 155, 157 (BIA 2013) (citing *Matter of Davis*, 20 I&N Dec. 536, 541 (BIA 1992)), or it must be a "drug trafficking crime" as defined in 18 U.S.C. § 924(c). INA § 101(a)(43)(B). Title 18, section 924(c) of the U.S. Code defines a "drug trafficking crime" as "any felony punishable under the Controlled Substances Act" ("CSA"). 18 U.S.C. § 924(c)(2); *see Lopez v. Gonzales*, 549 U.S. 47, 56 n.7, 60 (2006) (explaining that the state statute must "proscribe[] conduct punishable as a felony under that federal law"). Under the CSA, an offense is a felony if it is punishable by more than one year of imprisonment. *Lopez*, 549 U.S. at 56 n.7. Thus, a state offense must include the elements of an offense under the CSA and be punishable by more than one-year imprisonment to constitute an aggravated felony. *Id.* at 62.

On August 24, 2015, the Applicant was convicted of possession with intent to distribute a controlled substance, to wit: cocaine, under section 18.2-248 of the Virginia Code and was sentenced to ten years of imprisonment, with five years and six months suspended. *See* Exh. 8, Tab A at 2 (conviction records). The statute of conviction punishes the manufacturing, selling, giving, distributing, or possessing, with intent to do one of the aforementioned, of a controlled substance. Va. Code § 18.2-248. Similarly, the CSA also criminalizes manufacturing, distributing, dispensing, or possessing, with the intent to do one of the aforementioned, of a controlled substance. *See* 18 U.S.C. § 842(a)(1); *see also Hernandez-Nolasco v. Lynch*, 807 F.3d 95, 98 (4th Cir. 2015). Although the two statutes are very similar, an issue arises when comparing Virginia's definition of "controlled substance" with the federal definition. Virginia's schedules of controlled substances sweep more broadly than the federal controlled substance schedules. Specifically, there are fifteen substances, such as Salvinorin A, that appear on Virginia's Schedule I, but do not appear on any federal schedule. *Compare* Va. Code §§ 18.2-247(A), 54.1-3401, 54.1-3446 (listing Salvinorin A as a Schedule I controlled substance), *with* 21 U.S.C. §§ 802(6), 812 (not listing Salvinorin A in any schedule). Because section 18.2-248 can be violated by manufacturing, selling, giving, distributing, or possessing, with intent to do one of the aforementioned, of a substance such as Salvinorin A that is not federally controlled, the Immigration Court concludes the statute is overbroad. *See Descamps v. United States*, 570 U.S. 254, 264–65 (2013).

However, as the DHS points out, "that is not the end of the analysis." DHS Supp. Br. at 4. In some cases, the state statute of conviction will list "multiple, alternative elements, and so effectively create[] 'several different . . . crimes.'" *Id.* at 263–64 (quoting *Nijhawan v. Holder*, 557 U.S. 29, 41 (2009)). "If at least one, but not all of those crimes matches the generic [federal] version, a court needs a way to find out which the defendant was convicted of." *Id.* at 264. The "mechanism for making that comparison" is known as the "modified categorical approach," and it is applicable only in the "'narrow range of cases'" that involve such statutes. *Id.* at 261–63 (quoting *Taylor v. United States*, 495 U.S. 575, 602 (1990)). In those instances only, the Immigration Court may employ the modified categorical approach in order to "determine which particular offense the noncitizen was convicted of by examining the charging document and jury instructions, or in the case of a guilty plea, the plea agreement, plea colloquy, or some comparable

In the Matter of Jose Alberto SANCHEZ
A 076 – 388 – 332

judicial record of the factual basis for the plea." *Moncrieffe*, 569 U.S. at 191 (quoting *Nijhawan*, 557 U.S. at 35) (internal quotation marks omitted). However, the modified categorical approach is not applicable in a case involving a state statute that merely lists alternative means of commission of a single crime, as opposed to alternative elements of multiple crimes. *See Mathis v. United States*, 136 S. Ct. 2243, 2253, 2256 (2016).

Determining whether a disjunctive list in a criminal statute sets forth alternative elements of different crimes or instead "merely specifies diverse means of satisfying a single element of a single crime" is a multifaceted inquiry. *Id.* at 2249. "'Elements' are the 'constituent parts' of a crime's legal definition—the things the 'prosecution must prove to sustain a conviction.'" *Id.* at 2248 (quoting Black's Law Dictionary 634 (10th ed. 2014)). Elements are what the jury must find beyond a reasonable doubt to convict a defendant, or what the defendant necessarily admits when he pleads guilty. *Id.* "If statutory alternatives carry different punishments, then under [*Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)] they must be elements," not alternative means of commission. *Mathis*, 136 S. Ct. at 2256. State appellate court decisions or jury instructions may shed light on whether a disjunctive statutory list consists of alternative elements or alternative means of satisfying a single element. *See id.* If none of these indicators provides a clear answer about whether the listed items are means or elements, then the Court is permitted to "'peek'" at the record of the Applicant's conviction for "'the sole and limited purpose of determining whether [the listed items are] element[s] of the offense.'" *Id.* at 2256–57.

For the reasons DHS articulated in its brief, the Immigration Court agrees that section 18.2-248 of the Virginia Code is divisible as to the specific controlled substance at issue. DHS Supp. Br. at 5–9. Notably, when analyzing the statute at issue, the Virginia Supreme Court held that "the nature and amount of the confiscated substance [is an] *element[]* of the . . . offense[]." *Cypress v. Commonwealth*, 699 S.E.2d 206, 213 (Va. 2010) (emphasis added); *see also Sierra v. Commonwealth*, 722 S.E.2d 656, 660 (Va. Ct. App. 2012) (finding that "[t]he specific type of substance found in a defendant's possession is an *actus reus* element the Commonwealth must prove" in an analogous drug possession statute). Further, the Immigration Court found the model jury instructions for Virginia persuasive on the issue of divisibility. *See* DHS Supp. Br., Tab B (including copies of Virginia Model Jury Instr. No. G22-200, No. G22-240, and No. G22-360). Specifically, the jury instructions "include a blank space for insertion of the name of the particular drug alleged," *see* DHS Supp. Br. at 7–8; thus, for conviction, a jury must unanimously identify the specific controlled substance at issue. Accordingly, the Immigration Court finds the statute divisible.

Having found that section 18.2-248 of the Virginia Code is divisible, the Immigration Court may review a limited set of documents—including the charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trail judge to which the defendant assented—to determine whether the elements of the particular offense for which the Applicant was convicted constitutes an aggravated felony. *See Shepard*, 544 U.S. at 26. With its initial brief, the DHS submitted copies of the Applicant's final sentencing order and indictment, which both specify "cocaine" as the specific substance involved. *See* Exh. 8, Tab A at 1–2 (sentencing order specifying the crime as, "PWID COCAINE, SCH II SUB, FELONY"), 14 (indictment listing "cocaine, a Schedule II controlled substance" as the substance in involved). As previously discussed, similar to section 18.2-248 of the Virginia Code, the CSA criminalizes manufacturing,

distributing, dispensing, or possessing, with the intent to do one of the aforementioned, of a controlled substance. *See* 18 U.S.C. § 842(a)(1). "Cocaine" is listed as a Schedule II controlled substance under the CSA. *See* 21 U.S.C. § 812. Moreover, as the Fourth Circuit explained in *Hernandez-Nolasco v. Lynch*, "[u]nder the CSA, when the controlled substance involved in an offense is cocaine, possession with the intent to distribute that substance always is punishable as a felony." 807 F.3d at 98 (citing 21 U.S.C. §§ 841(a), 841(b)(1)(C); 21 C.F.R. § 1308.12). Accordingly, the Immigration Court finds the elements of the Applicant's conviction under section 18.2-248 of the Virginia Code correspond to the elements of offense under the CSA that is punishable as a felony; thus, the Applicant's conviction is an aggravated felony. *Lopez*, 549 U.S. at 62. Further, because the Applicant was sentenced to ten years imprisonment, with five years and six months suspended for this aggravated felony conviction, *see* Exh. 8, Tab A at 2 (conviction records), the Immigration Court finds it constitutes a particularly serious crime *per se*.[2] INA § 241(b)(3)(B); 8 C.F.R. § 1208.16(d)(2); *Y-L-*, 23 I&N Dec. at 273. Thus, the Applicant is barred from withholding of removal under the Act and the CAT. INA § 241(b)(3)(B)(ii); 8 C.F.R. § 1208.16(c)(4), (d)(2).

### C. Deferral of Removal under the CAT

An applicant who is subject to the provisions for mandatory denial of withholding of removal under the CAT remains eligible for deferral of removal to the country where he is more likely than not to be tortured. *See* 8 C.F.R. § 1208.17(a). To acquire protection under the CAT, the applicant must demonstrate a clear probability he will be tortured if removed to Mexico. *See* 8 C.F.R. § 1208.16(c)(2). Torture constitutes any act that (1) causes severe physical or mental pain or suffering; (2) is intentionally inflicted; (3) is inflicted for a proscribed purpose; (4) is inflicted by, at the instigation of, or with the acquiescence of a public official or one acting in an official capacity; and (5) does not arise from lawful sanctions. *Matter of J-E-*, 23 I&N Dec. 291, 297 (BIA 2002); 8 C.F.R. § 1208.18(a). To prove acquiescence, an applicant must do more than show the government is powerless to stop the torture. *See Lopez-Soto v. Ashcroft*, 383 F.3d 228, 240–41 (4th Cir. 2004). Acquiescence requires that a public official "have awareness of [the] activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7). The Fourth Circuit applies the "willful blindness" standard, by which "government officials acquiesce to torture when they have actual knowledge of *or* turn a blind eye to torture." *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 245 (4th Cir. 2013) (emphasis added).

Unlike asylum and withholding of removal under the Act, protection under the CAT does not require a showing of nexus between the torture and a statutorily protected ground. *See* 8 C.F.R. § 1208.18(a)(1). Nevertheless, an applicant must demonstrate he faces a particularized risk of torture. *See Singh v. Holder*, 699 F.3d 321, 334 (4th Cir. 2012) ("[T]he mere existence of a pattern of human rights violations in a particular country does not constitute a sufficient ground for finding that a particular person would more likely than not be tortured."). The Immigration

---

[2] The Immigration Court notes that the Applicant was also convicted of possession with intent to distribute .5 ounces to 5 pounds of marijuana in violation of section 18.2-248.1 of the Virginia Code, which the Applicant focused on in his brief regarding his eligibility for withholding of removal, *see* Resp't Br. at 3–20; however, the Immigration Court need not address these arguments because, for the reasons outlined above, it finds his conviction under section 18.-248 of the Virginia Code is a particularly serious crime *per se*.

In the Matter of Jose Alberto SANCHEZ
A 076 – 388 – 332

Court considers all relevant evidence when determining CAT claims, including evidence of past torture,[3] the individual's ability to relocate to another part of the country where he is not likely to be tortured, human rights violations in the country of removal, and any other relevant country-specific conditions. 8 C.F.R. § 1208.16(c)(3)(i)–(iv).

The Applicant fears members of Los Zetas will torture or kill him if he returns to Mexico in retaliation for the police confiscating drugs and money from the Applicant's home in Virginia in 2009.[4] Although the Applicant did not specifically identify a hypothetical chain of events that he believes would lead to his torture or death, the Immigration Court infers from his testimony and the evidence presented that he believes the following is more likely than not to occur: (1) Los Zetas will seek retaliation against the Applicant for the loss of their drugs and money; (2) Los Zetas will learn when the Applicant has been removed to Mexico and locate the Applicant through its criminal network; and (3) Los Zetas will torture or kill the Applicant with the acquiescence of the Mexican government. For the following reasons, the Immigration Court finds that the Applicant has established every step in this hypothetical chain of events is more likely than not to occur.

To begin, the Applicant established a clear probability Los Zetas would seek retaliation against him for the loss of their drugs and money. Record evidence establishes that Los Zetas are one of the most violent drug cartels in Mexico. *See* Exh. 3, Tab D at 32 ("During a three-day period in 2011, some 300 individuals were murdered in apparent revenge killings throughout northern Coahuila by assassins from the Zeta cartel."); Tab E at 35 (explaining that Los Zetas was "[o]riginally a paramilitary group for the Gulf Cartel" and "was singled out in 2007 by the [Drug Enforcement Administration] as the country's most 'technologically advanced, sophisticated, and violent' group"), Tab H at 53 (stating that Los Zetas have a "reputation for being particularly savage" and are known for "massacres, killing civilians, leaving body parts in public places and posting killings on the internet"), Tab M at ¶ 14 ("Because of their armed forces background Los Zetas *modus operandi* is different from other cartel organizations in that they . . . tend to resort to violence first—often times extreme violence."). Moreover, Los Zetas, in particular, are known to be extremely ruthless when dealing with those it believes have crossed them. As Colonel Kirkland explained, transnational criminal organizations ("TCOs"), like Los Zetas, "have very long memories and do not let transgressions go unpunished because that would be viewed as weakness." *Id.*, Tab M at ¶ 26. To that end, they "keep very good records and track those who have wronged them sending the strong message that neither time nor distance will prevent eventual retribution

---

[3] DHS counsel suggested in closing that because the Applicant did not experience past torture, he had not met his burden to "demonstrate all of the requirements under the CAT." The Immigration Court wishes to clarify that evidence of past torture is but one factor to be considered in a CAT analysis, and the absence of such evidence does not foreclose an applicant's ability to establish his eligibility for protection under the CAT. *See generally* 8 C.F.R. § 1208.16(c)(3)(i).

[4] The Applicant also alleged he fears the family of Lucas Flores will harm him if he returns to Mexico as part of an ongoing conflict regarding ownership of the Applicant's family ranch. Although the Fourth Circuit recently joined the Third and the Ninth Circuits in holding that when an applicant fears torture from multiple actors, "the risks of torture *from all sources* should be combined when determining whether a CAT applicant is more likely than not to be tortured in a particular country," *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 973 (4th Cir. 2019) (emphasis added), because the Immigration Court finds the Applicant established his eligibility for deferral of removal under the CAT based on his fear of Los Zetas, it need not address this additional claim.

In the Matter of Jose Alberto SANCHEZ
A 076 – 388 – 332

for actions." *Id.*

  Record evidence further establishes that Los Zetas have a motive for seeking retribution against the Applicant. In 2009, the police confiscated drugs—including approximately 106 grams of cocaine and 10 ounces of marijuana, *see* Exh. 8, Tab A at 10 (lab report), from the Applicant's house, which he later learned had been supplied by Los Zetas.[5] Colonel Kirkland confirmed that, based on his experience with "TCOs in Mexico and understanding of [the Applicant's] case, it is difficult for [him] to envision a scenario where members of Los Zetas would not seek to retaliate against [the Applicant] for stealing drugs from them." Exh. 3, Tab M at ¶ 32. In addition to having a motive to harm the Applicant, record evidence also establishes Los Zetas have already threatened the Applicant, both directly and indirectly. In August 2009, after the raid, two Los Zetas associates beat him and threatened to kill him if he did not pay back the money that was lost.[6] *See id.*, Tab P at 91. In addition to the personal attack and threats on the Applicant, both he and his sister credibly testified that members of Los Zetas cartel have continually harassed and threatened members of the Applicant's family living in Mexico, including two of his uncles and his children. *See id.*, Tab Q (affidavit of the Applicant's uncle, Juan Flores, that he has received phone call threats from Los Zetas asking, "Is [the Applicant] still incarcerated in Virginia? When is he coming back? Where can you find him? Does he think we forgot what he did? He will suffer the consequences when he comes back to Mexico."). Thus, when considering this evidence, the Immigration Court finds the Applicant established Los Zetas would seek retribution against the Applicant for losing their drugs and money in 2009.

  Next, the Applicant established a clear probability Los Zetas would learn when the Applicant has been removed to Mexico and would be able to locate him through its vast criminal network. As discussed above, it is clear from the evidence presented that Los Zetas is actively

---

[5] DHS counsel noted in closing that the Applicant's claim is "really a financial dispute" where he "lost money for the Los Zetas" and that such a scenario "is not the purpose of relief under the CAT." Notably, DHS counsel did not cite to any applicable laws supporting this assertion, and the Immigration Court finds DHS's conjecture incorrect. Unlike asylum and withholding of removal under the Act, CAT protection does not require a showing of nexus between the torture and a statutorily protected ground. *See* 8 C.F.R. § 1208.18(a)(1). The only inquiry is whether the Applicant has met his burden to establish a clear probability of torture, which is defined as any act that (1) causes severe physical or mental pain or suffering; (2) is intentionally inflicted; (3) is inflicted for a proscribed purpose; (4) is inflicted by, at the instigation of, or with the acquiescence of a public official or one acting in an official capacity; and (5) does not arise from lawful sanctions. *J-E-*, 23 I&N Dec. at 297; 8 C.F.R. § 1208.18(a). Nothing in this definition precludes an applicant from establishing eligibility for CAT based on a financial dispute; thus, the Immigration Court will disregard this argument.

[6] In closing, DHS counsel questioned the connection between the individuals who threatened the Applicant following the confiscation of the drugs and money and Los Zetas. The Immigration Court acknowledges that Colonel Kirkland, and additional country conditions evidence, confirms that Los Zetas do not directly have a presence in the Washington, D.C. area. *See e.g.*, Exh. 3, Tab M at ¶ 23 ("The Mexican Cartels such as Los Zetas, while powerful in Mexico, are not involved greatly in distribution once illegal drugs hit the U.S. border."). However, the record establishes Los Zetas is known to utilize proxies—including local gangs and others involved in the drug trafficking industry—in the United States to distribute drugs therein. *Id.* ("This wholesale trafficking turns into the more micro-distribution process of retail distribution. U.S. gang members are crucial in filling this role of transporting and selling illegal drugs in the United States.") Based on the record, the Immigration Court finds there is sufficient evidence to connect the men who threatened and beat the Applicant in the United States with Los Zetas, particularly considering the Applicant credibly testified that the men identified themselves as associates of Los Zetas during the attack, *see id.*, Tab P at 91, and the more recent threats by members of Los Zetas to the Applicant's family members in Mexico. *See id.*, Tabs O, Q.

In the Matter of Jose Alberto SANCHEZ
A 076 – 388 – 332

seeking information about the Applicant's whereabouts by threatening and harassing his family members in Mexico. *See* Exh. 3, Tabs N–O, Q. In addition to those efforts to locate the Applicant, Colonel Kirkland explained that the Applicant's status as a criminal deportee makes it significantly easier for the cartel to learn of his removal and locate him throughout Mexico. *See id.*, Tab M at ¶¶ 28–33. In January 2014, the U.S. Department of State and DHS "signed an agreement to expand a Criminal History Information Sharing (CHIS) program . . . to share more information on deportees with Mexican law enforcement officials," *id.* at ¶ 28; thus, upon removal, criminal deportees, like the Applicant, are put into a federal database that is accessible to government employees, as well as state and local law enforcement. In addition to the CHIS program, the Applicant will also be "required to carry a *Carta de Residencia*, which serves as a temporary identification card, but also identifies him as a criminal deportee." *Id.* Further, if the Applicant wants to work in Mexico, he will also have to apply for a *"Credencial de Elector del Instituto Nacional Electoral*," which requires he disclose his address. *Id.* Accordingly, the evidence establishes that the Applicant's deportation to Mexico and his residential address will be information that is readily accessible to public officials and law enforcement.

The evidence further establishes that Los Zetas will be able to access that information either by bribing a public official or law enforcement officer or through a corrupt official already working in coordination with the cartel. As Colonel Kirkland explained,

> It should be noted that cartels such as Los Zetas have government officials at all levels under their pay. Los Zetas can easily obtain information on the address and current location of persons through their government contacts. *It is difficult if not impossible, for a returning deportee to avoid detection from Los Zetas.*

*Id.* at ¶ 29 (emphasis added). Country conditions evidence confirms that corrupt practices like accepting bribes and working in coordination with criminal organizations like Los Zetas is not an isolated problem; rather, this type of corruption is a persistent and systemic issue in Mexico. *See e.g.,* Exh. 3, Tab B at 24 (explaining that Mexican citizens have a "hardened skepticism about the honesty of the nation's political class and the strength of its government institutions in a culture of rampant corruption and impunity"); Tab C at 29 ("Allegations that Mexican politicians have acted in cahoots with drugs cartels have been common for decades, though such accusations have seldom resulted in thorough investigations, let alone criminal convictions."), 29 ("[Los Zetas] also spent millions on bribery, according to testimony gathered in this week's report and given in separate criminal trials between 2013 and 2016."), 29 ("The Zetas paid bribes and integrated police officers into their hierarchy to ensure the cartel would be able to continue their illicit operations without resistance."); Tab D at 32 ("Indeed, there are compelling reasons to believe that the complicity of corrupt public officials in cartel-led atrocity crimes may be a widespread, recurrent pattern."). Corruption is particularly pervasive in local government where bribes are used to supplement low incomes. *See id.*, Tab M at ¶ 9 ("Two-thirds of local police earn less than $300 per month, and the remaining earn less than $100 per month. Bribes from TCOs or local officials with money (often drug related) greatly exceed monthly salaries. In this environment of fear and bribery, the local populace has good reason not to trust the municipal police."); *see also id.*, Tab J; Exh. 5 at 24 (2018 Human Rights Report stating, "There were numerous reports of government corruption during the year. Corruption at its most basic level involved paying bribes for routine services or in lieu of fines to administrative officials or security forces"). Accordingly, the Applicant

In the Matter of Jose Alberto SANCHEZ
A 076 – 388 – 332

established a clear probability Los Zetas would learn of his removal and be able to locate him in Mexico.

For many of the same reasons discussed when assessing whether Los Zetas would seek to retaliate against the Applicant, the Immigration Court finds the Applicant established Los Zetas will torture or kill him once they find him in Mexico. Los Zetas are known as the most violent drug cartel in Mexico, particularly against those it perceives as having wronged the cartel. *See* Exh. 3, Tab D at 32 (describing incident where Los Zetas murdered 300 people for revenge); Tab E at 35 (explaining the origins of Los Zetas and that their violent nature has been credited to their history within the military), Tab H at 53 (stating that Los Zetas have a "reputation for being particularly savage" and are known for "massacres, killing civilians, leaving body parts in public places and posting killings on the internet"), Tab M at ¶ 14 ("Because of their armed forces background Los Zetas *modus operandi* is different from other cartel organizations in that they . . . tend to resort to violence first—often times extreme violence."). Considering Los Zetas have a clear motive for seeking to retaliate against the Applicant, the ability to locate him through corrupt or bribed government officials, and the proclivity for extreme violence, the Immigration Court finds the Applicant established Los Zetas would ultimately torture or kill him upon removal to Mexico.

Further, the Applicant has established his torture or death by Los Zetas would be with the Mexican government's acquiescence. The Fourth Circuit utilizes the "willful blindness" standard to assess government acquiescence, which requires an applicant demonstrate public officials have either "actual knowledge of *or* 'turn a blind eye to torture.'" *Suarez-Valenzuela*, 714 F.3d at 245–46 (emphasis added). As discussed above, based on independent country conditions evidence and the Applicant's expert witness, the Immigration Court finds a clear probability exists that Los Zetas would successfully bribe a public official or utilize a corrupt public official who already works in coordination with the cartel to locate the Applicant in Mexico through information he will be required to provide the government upon his removal. The Immigration Court finds that the act of handing over the address or location of a Mexican citizen the cartel seeks revenge against constitutes willful blindness. The public official is essentially turning a blind eye to the clear probability that such a disclosure will result in the torture or death of that citizen. The Immigration Court's conclusion is fully supported by the record, particularly considering Los Zetas' well-known reputation for extreme and disturbing acts of violence against those it perceives as crossing them. *See* Exh. 3, Tabs D–E, H, M at ¶ 14.

In making the above findings, the Immigration Court has carefully considered the evidence presented by the DHS concerning the current power and strength of Los Zetas in Mexico, as well as the Mexican government's efforts to combat drug trafficking and corruption. *See e.g.*, Exh. 3, Tab C at 29 (confirming that Los Zetas "have been weakened in recent years after their senior leaders were kidnapped or killed and the group split into rival factions"), Tab E at 35 ("[Los Zetas] has reportedly lost power in recent years."); Exh. 5 at 1–4 (discussing the newly-elected Mexican president's plans to implement a "50-point plan to fight corruption and reduce privileges for officials"); Exh. 9, Tabs H at 45–48 (discussing recent arrests of Los Zetas leaders and including maps demonstrating their loss of territory between 2012 and 2017), I at 49–50 (confirming that the Mexican government's crackdown on drug cartels led to a decrease in power for cartels like Los Zetas); Exh. 11 (article confirming that Los Zetas have lost power and are not expanding as rapidly

In the Matter of Jose Alberto SANCHEZ
A 076 – 388 – 332

as they once were). Despite the fact that Los Zetas are not as powerful as they were in 2012 and do not control as much territory in Mexico, record evidence establishes they nonetheless remain a very dangerous drug cartel capable of locating and killing people in Mexico. As Colonel Kirkland explained, "[d]espite fragmentation, Los Zetas . . . continue to exercise strong control over the drug trafficking" in certain areas of Mexico, primarily in Zacatecas where the Applicant grew up and would likely return. Exh. 3, Tab M at ¶¶ 15–16. Further, although the Mexican government has been working to combat drug trafficking and the power of the various Mexican drug cartels, their endeavors have largely led to more violence. As of 2018, "homicides hit a new high at more than twenty-eight thousand; many were linked to drug cartels."[7] "Experts attribute this to the continued fallout of [the Mexican government's] kingpin strategy and territorial feuds between gangs." *Id.* The Immigration Court acknowledges that the current President of Mexico, Andrés Manuel López Obrador, who was elected in 2018, has stated his intentions to change strategies with regard to combatting the cartels and police corruption. *See* Exh. 5 at 1–8. Although commendable, it remains to be seen whether these policies will be effective. As country conditions currently stand, government officials and law enforcement are systemically corrupt and highly susceptible to bribes by drug cartels. As Colonel Kirkland testified, it is an "easy thing" for Los Zetas to obtain information on persons-of-interest through bribery or through government employees already employed by the cartel. *See* Exh. 3, Tab M at ¶ 29 ("It should be noted that cartels such as Los Zetas have government officials at all levels under their pay. Los Zetas can easily obtain information on the address and current location of persons of interest through their government contacts. It is difficult, if not impossible for a returning deportee to avoid detection from Los Zetas."). Country conditions evidence confirms these are not isolated, rogue actors; rather, the culture of government collusion with drug cartels like Los Zetas and bribery is systemic and widespread. *See e.g., id.,* Tab C at 29 ("Allegations that Mexican politicians have acted in cahoots with drugs cartels have been common for decades, though such accusations have seldom resulted in thorough investigations, let alone criminal convictions.") Accordingly, despite the Mexican government's efforts to combat these issues, a clear probability remains that a government official will turn over the Applicant's information to Los Zetas, which the Immigration Court finds constitutes willful blindness.

The Immigration Court further finds that the Applicant cannot internally relocate within Mexico to avoid torture or death. 8 C.F.R. § 1208.16(c)(3)(ii). As explained in detail above, the Mexican government requires its citizens, and particularly criminal deportees, to disclose certain information, which they keep in a centralized database. Notably, in order to find employment in Mexico, the Applicant will have to apply for a "*Credencial de Elector del Instituto Nacional Electoral,*" which requires "proof of address within three months." Exh. 3, Tab M at ¶ 28. Further, "if a person's address changes, this must be updated." *Id.* Thus, if the Applicant wishes to obtain employment in Mexico—which he will need to do in order to support himself— he must comply with the government's disclosure requirements, which will make him easily locatable by Los Zetas. Moreover, although record evidence establishes Los Zetas has lost significant territory since 2012, *see* Exh. 9, Tab H at 47–48 (showing maps of the territorial changes), Colonel Kirkland confirmed that Los Zetas could still locate and harm the Applicant even if he moved within the territory of a rival gang. His affidavit states,

---

[7] Pursuant to 8 C.F.R. § 1003.1(d)(3)(iv), the Immigration Court takes administrative notice of the updated version of the article found at Exhibit 3, Tab E. *See* Council on Foreign Relations, *Mexico's Drug* War (last updated Jan. 24, 2019), https://www.cfr.org/backgrounder/mexicos-drug-war.

In the Matter of Jose Alberto SANCHEZ
A 076 – 388 – 332

> [D]espite turf battles, the rival [cartels] find it in their interest to inform each other of returning 'persons of interest' in order to instill fear in those who run afoul of the [cartels]. It is highly probable, then, that Los Zetas will find out where [the Applicant] is living in Mexico and will inform the cartels in that area of Mexico to harm [the Applicant].

Exh. 3, Tab M at ¶¶ 26–27. Thus, the record is clear that the Applicant cannot relocate to avoid the threat of torture or death Los Zetas pose. Accordingly, when considering the totality of the evidence presented, the Immigration Court concludes that the Applicant established a clear probability Los Zetas will torture or kill him if he is removed to Mexico with the acquiescence of a Mexican public official; therefore, the Immigration Court grants the Applicant's application for deferral of removal under the CAT.

### IV. CONCLUSION

The Immigration Court finds that the Applicant is barred from withholding of removal under the Act and the CAT for having been convicted of a particularly serious crime, *see* INA § 241(b)(3)(B)(ii); 8 C.F.R. § 1208.16(c)(4), (d)(2); however, because the Applicant established a clear probability he would be tortured or killed by, at the instigation of, or with the acquiescence of a Mexican public official or one acting in an official capacity, the Immigration Court grants the Applicant's application for deferral of removal under the CAT.

Accordingly, the Immigration Court enters the following orders:

### ORDERS

| | |
|---|---|
| *It is Ordered that*: | The Applicant be **REMOVED** to **MEXICO** pursuant to the prior removal order. |
| *It is Further Ordered that*: | The Applicant's applications for withholding of removal under the Act and the CAT be **DENIED**. |
| *It is Further Ordered that*: | The Applicant's application for deferral of removal under the CAT be **GRANTED**. |

7/23/19
Date

Helaine R. Perlman
Immigration Judge

**APPEAL RIGHTS:** Both parties have the right to appeal the decision in this case. Any notice of appeal must be received at the Board of Immigration Appeals within thirty (30) calendar days after the date of service of this decision.